IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | |
|---|---|
| PHYLLIS L. BYERS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) NO. 4:04-CV-86 |
| | ) |
| METROPOLITAN SCHOOL DISTRICT | ) |
| OF WARREN COUNTY, | ) |
| | ) |
| Defendant. | ) |

## OPINION AND ORDER

This matter is before the Court on the Motion for Summary Judgment, filed by Defendant, Metropolitan School District of Warren County, on January 30, 2006. For the reasons set forth below, this motion is **GRANTED**. Accordingly, the Clerk is **ORDERED to DISMISS** this case **with prejudice**.

BACKGROUND

On November 23, 2004, Plaintiff, Phyllis L. Byers, brought suit against her former employer, Defendant, Metropolitan School District of Warren County ("MSD"), alleging discrimination in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq*. Defendant has filed the instant motion claiming there is no genuine issue of material fact and it is entitled to judgment as a matter of law.

DISCUSSION

The standards that generally govern summary judgment motions are familiar. Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper only if it is demonstrated that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *See Nebraska v. Wyoming*, 507 U.S. 584, 590 (1993); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). In other words, the record must reveal that no reasonable jury could find for the nonmovant. *Karazanos v. Navistar Int'l Transp. Corp.*, 948 F.2d 332, 335 (7th Cir. 1991); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). In deciding a motion for summary judgment, a court must view all facts in the light most favorable to the nonmovant. *Anderson*, 477 U.S. at 255; *Nucor Corp. v. Aceros Y Maquilas De Occidente*, 28 F.3d 572, 583 (7th Cir. 1994).

The burden is upon the movant to identify those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits," if any, that the movant believes demonstrate an absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. Once the movant has met this burden, the nonmovant may not rest upon mere allegations but "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *Becker v. Tenenbaum-Hill Assocs., Inc.*, 914 F.2d 107, 110 (7th Cir. 1990); *Schroeder v. Lufthansa German Airlines*, 875 F.2d 613, 620

(7th Cir. 1989). "Whether a fact is material depends on the substantive law underlying a particular claim and 'only disputes over facts that *might affect the outcome* of the suit under governing law will properly preclude the entry of summary judgment.'" *Walter v. Fiorenzo*, 840 F.2d 427, 434 (7th Cir. 1988) (citing *Anderson*, 477 U.S. at 248).

"[A] party who bears the burden of proof on a particular issue may not rest on its pleading, but must affirmatively demonstrate, by specific factual allegations, that there is a *genuine* issue of material fact which requires trial." *Beard v. Whitley County REMC*, 840 F.2d 405, 410 (7th Cir. 1988) (emphasis in original); *see also Hickey v. A.E. Staley Mfg.*, 995 F.2d 1385, 1391 (7th Cir. 1993). Therefore, if a party fails to establish the existence of an essential element on which the party bears the burden of proof at trial, summary judgment will be appropriate. In this situation, there can be "'no genuine issue as to any material fact', since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323.

Facts

In May 2001, Byers taught third grade at MSD. (Pl. Dep. p. 17). After that time, Sherry Shamp was the Title I teacher at MSD; Title I is a federally funded program. Byers and Sherry Shamp asked MSD

principal James Beyer if they could switch positions for the 2001-2002 academic year. (Pl. Dep. p. 17). Principal Beyer approved the requests to switch. (Beyer Aff. ¶ 4).

Starting in the 2001-2002 academic year, MSD became the recipient of a three year CAPE grant from the Lily Foundation. (Roderick Aff. ¶ 5; Beyer Aff. ¶ 3). The CAPE grant was used to fund Reading Recovery programs at three elementary schools in Warren County, including MSD. (Roderick Aff. ¶ 5). Reading Recovery is a specialized remedial teaching technique that includes one-on-one instruction. (Roderick Aff. ¶ 5). Teachers must be specially trained to be eligible to teach Reaching Recovery programs. (Roderick Aff. ¶ 5). During the time the CAPE grant was in effect, MSD offered separate Title I and Reading Recovery programs; Byers was the Title I teacher and Pam Larson and Melanie Nelson were Reading Recovery teachers. (Roderick Aff. ¶ 5).

The CAPE grant was set to expire at the end of the 2003-2004 school year. (Roderick Aff. ¶ 6). During the fall of 2003, MSD reached an agreement with the Warren County Education Association ("WCEA"), the teachers' union regarding the transition of losing the CAPE grant. (Roderick Aff. ¶ 6). The school district offered a one-time-only $15,000 incentive to teachers who agreed to retire at the end of the 2003-2004 school year. (Roderick Aff. ¶ 6). The purpose of this incentive was to try to avoid releasing staff members hired with CAPE grant funding due to the termination of that funding.

(Roderick Aff. ¶ 6). To receive the incentive, eligible teachers were required to submit their resignation on or before January 1, 2004. (Roderick Aff. ¶ 6; Ex. A). Superintendent Terry Roderick sent a letter to all teachers setting forth the details of the incentive and the deadlines to qualify; the letter stated that teachers could come to Roderick's office to discuss their options. (Roderick Aff. ¶ 6; Ex. B).

Also during the fall of 2003, MSD administrators discussed the phasing out of the CAPE grant with the WCEA. (Roderick Aff. ¶ 7). The WCEA was informed that the separate Reading Recovery program would be eliminated and the Title I program would be modified to include Reading Recovery techniques. (Roderick Aff. ¶ 7). This necessitated Title I teaching positions to be filled by teachers trained in Reading Recovery. (Roderick Aff. ¶ 7; Beyer Aff. ¶ 5). Byers does not have the required specialized Reading Recovery training. (Pl. Dep. p. 35, 63; Roderick Aff. ¶¶ 9, 17; Beyer Aff. ¶ 10).

Byers was not a member of the WCEA and, therefore, did not attend the meeting. WCEA president, Jeff Turner, told Byers that the Title I program was being eliminated and replaced by Reading Recovery. (Pl. Dep. p. 12, 39-47). When Beyer asked Turner how the alleged replacement of Title I with Reading Recovery would affect her, Turner said the school corporation would offer her an open first grade position at Williamsport Elementary School. (Pl. Dep. p. 39-40).

In the fall of 2003, other teachers at MSD began to ostracize her

once it was known that she would not be in the Title I position the following year. (Pl. Dep. p. 30-31). Also, a teacher told Byers that Pam Larson would be the new Title I teacher. (Pl. Dep. p. 30-31).

In November or December 2003, Byers was discussing anticipated openings in the school corporation with another teacher in the faculty lounge. (Pl. Dep. p. 55-56; 59). Principal Beyer overheard the conversation and told them that there were no openings at Warren Central, but there would be other positions in the school district. (Beyer Aff. ¶ 6). Byers told Principal Beyer that she wanted the first grade position at Williamsport. (Pl. Dep. p. 55; Beyer Aff. ¶ 7). In response, Principal Beyer said "I don't have to give you that job," and "what makes you think you deserve the position." (Pl. Dep. p. 56). Nevertheless, Principal Beyer told her that he would pass her request on to the superintendent and that the school district had the right to assign teachers. (Beyer Aff. ¶ 7).

Although Turner had told Byers that the school corporation would have to offer her the Williamsport position, she had not received an offer by November 2003. (Pl. Dep. p. 58). As such, she decided to meet with superintendent Roderick about the Williamsport job. (Pl. Dep. p. 59). Byers called Roderick to set up a meeting. (Pl. Dep. p. 61). The meeting was arranged for December 2, 2003, and Roderick agreed that Byers' husband, Larry, could attend. (Pl. Dep. p. 61, 62). At the meeting, Larry did most of the talking because Byers was too emotional. (Pl. Dep. p. 88). Larry told Roderick that he was

retiring from a teaching position at the Lafayette School Corporation to build up his business, and that Byers wanted to teach for a few more years. (Pl. Dep. p. 60, 89). Roderick told them that Title I was being eliminated and replaced with Reading Recovery, and because Byers did not have Reading Recovery training, she would not be placed in that position. (Pl. Dep. p. 61-62). Despite this, Larry repeated that Byers wanted to teach. Roderick responded, "you know when it is time to retire." (Pl. Dep. p. 63). When Larry again said Byers wanted to continue teaching, Roderick told them about the first grade teaching position in Williamsport. (Roderick Aff. ¶ 9; Beyer Aff. ¶ 6; Pl. Dep. p. 64). However, Roderick said he would have to check with the Williamsport principal to see if Byers was suited for the position. (Beyer Aff. ¶ 6; Pl. Dep. p. 65-66). Roderick also said that if Byers wanted to continue teaching, she could substitute or get a job at a parochial school. (Pl. Dep. pp. 63-66; Beyer Aff. ¶ 11; Pl. Dep. p. 66). After discussing the teaching situation, Roderick talked about the retirement package, including the incentive, that was available. (Pl. Dep. pp. 73-74). After the meeting, Roderick told Byers, "you do hold your age well." (Beyer Aff. ¶ 8; Byers Dep. p. 74).

At the end of the meeting, it was undecided whether Plaintiff would retire. (Pl. Dep. p. 75). According to Byers, the retirement incentive had no impact on her decision to retire. (Pl. Dep. p. 75). Byers and her husband were going to make a decision and get back to

Roderick. (Pl. Dep. p. 75). On December 4, 2003, Roderick phoned Byers and told her that he needed her resignation because "they needed to know how many people were retiring." (Pl. Dep. p. 82-83). Byers also recalls that Roderick did mention something about the retirement incentive during this call. (Pl. Dep. p. 83).

Article I, Section B of the 2003-2004 contract between MSD and WCEA allows the school board to direct the work of its employees and to "hire, promote, demote, transfer, assign, and retain employees." (Roderick Aff. ¶ 10; Ex. C). The reduction in force agreement between MSD and WCEA required the school corporation to lay off teachers with the least seniority first. (Roderick Aff. ¶ 10; Ex. D). As of the fall of 2003, forty-one (41) elementary education teachers had less seniority than Byers; thus, under the agreement Byers would have remained employed despite being removed from the Title I position based on her seniority even if another less senior teacher lost his or her position. (Roderick Aff. ¶ 10; Ex. D). Byers understood that because of her seniority, if there was a position open that she was qualified for, she would be entitled to that position. (Pl. Dep. p. 87). No one ever told her anything to the contrary. (Pl. Dep. p. 87).

On December 18, 2003, Byers sat down and typed her letter of resignation. (Pl. Dep. p. 95). She informed her husband of her decision to retire only after she had resigned. (Pl. Dep. p. 96). Larry was very upset with her resigning. (Pl. Dep. p. 96).

On January 9, 2004, Byers' sister, Aileen Hollis, called her after a WCEA discussion meeting and told her that the Title I program was not being eliminated and, instead, it was the Reading Recovery that was being abolished. (Pl. Dep. p. 96-97). Plaintiff, feeling as though she had been lied to about the Title I position being eliminated, requested to rescind her resignation. (Pl. Dep. p. 96). Roderick denied Plaintiff's request. (Roderick Aff. ¶ 16). Since the 2004-2005 school year, the Title I position at MSD has been filled by teachers whom have been trained in Reading Recovery and use Reading Recovery techniques. (Roderick Aff. ¶ 17).

ADEA

The ADEA proscribes employment discrimination on account of a person's age. 29 U.S.C. § 623. There are two methods by which a plaintiff may show employment discrimination: the direct and indirect methods. *Krchnavy v. Limagrain Genetics Corp.*, 294 F.3d 871, 875 (7th Cir. 2002). Plaintiff attempts to proceed under both theories.

"[W]hether a plaintiff proceeds under the direct or indirect method, evidence establishing that an adverse employment action has actually taken place is an essential element of the claim." *Hottenroth v. Village of Slinger*, 388 F.3d 1015, 1029 (7th Cir. 2004); 29 U.S.C. § 623(a). Here, the threshold issue is whether Byers suffered an adverse employment action. As Plaintiff was not terminated by Defendant but, rather, she resigned from employment,

Plaintiff asserts that she was constructively discharged. Specifically, Plaintiff claims that, although no one told her that she would be fired if she did not retire, "it is clear from the record that every indication given to [her] was that she would either resign or face termination." (Pl. Mem. in Resp., p. 5).

Constructive discharge occurs when an employee resigns because working conditions are so intolerable that a reasonable employee would feel compelled to quit. *Hunt v. City of Markham*, 219 F.3d 649, 655 (7th Cir. 2000). This Circuit, however, has noted that invoking the doctrine of constructive discharge is limited to egregious cases. *Lifton v. The Bd. of Educ. of the City of Chicago*, 416 F.3d 571, 578 (7th Cir. 2005). Moreover, "[a]bsent extraordinary conditions, a complaining employee is expected to remain on the job while seeking redress [for ADEA violations]." *Cooper-Schut v. Visteon Auto. Sys.*, 361 F.3d 421, 428-29 (7th 2004)(citations omitted). Thus, an employee is deemed to have not "acted reasonably if she assumes the employer will fail to protect her without allowing the employer a chance to try." *Id*.

Plaintiff's claim of constructive discharge cannot stand because the record does not support her assertion that she would have been terminated had she not retired. During the December 3, 2003, meeting, Roderick informed Plaintiff of an open position in Williamsport that she may be qualified for. While Roderick did not offer that teaching position to Plaintiff at the meeting, he informed her that he would

check to see if she was qualified to be placed in that position. Moreover, the reduction in force agreement between MSD and WCEA – which Plaintiff understood – would have required 41 teachers with less seniority to be laid off before Plaintiff could be. Indeed, WCEA President Turner told Byers that she would get the first grade position at Williamsport. There is no evidence in the record that MSD had violated, or were going to violate, that agreement. As such, Plaintiff acted unreasonably in resigning before allowing MSD to place her in a teaching position for the 2004-2005 school year. *Cooper-Schut*, 361 F.3d at 428-29. Simply, Plaintiff's subjective belief that she would be terminated if she did not retire was unreasonable and not supported by the record.

Plaintiff's chief complaint surrounds the retirement incentive she was offered. While MSD did offer an incentive for Plaintiff to retire, this does not give rise to an ADEA violation, per se. *Henn v. Nat'l Geographic Soc'y*, 819 F.2d 824 (7th Cir. 1987). Plaintiff makes much of the fact that she was told that she would have to resign to receive a retirement incentive. However, "an offer of incentives to retire early is a benefit to the recipient, not a sign of discrimination. *Id*. at 828. Thus, Byers being told to resign by January 1, 2004, or she would not be eligible for the $15,000 incentive, is not discriminatory.

Encouraging an employee to retire with an incentive can only amount to a constructive discharge when there is evidence that a

reasonable employee would not feel free to ignore the suggestion. *Brown v. Ameritech Corp.*, 128 F.3d 605, 608 (7th Cir. 1997); *Henn*, 819 F.2d at 828-29. Given this backdrop, it is evident that Plaintiff was not forced into involuntary retirement. At most, Plaintiff's exact position for the 2004-2005 academic year was unsettled at the time she resigned. This merely amounts to the possibility that she may be terminated at the end of the 2003-2004 academic year. Again, before this could take place, however, Plaintiff would have the right to contest that firing pursuant to the agreements between MSD and the WCEA, which she knew and understood; Roderick never mentioned nor suggested that Plaintiff's contract would be cancelled or that she would be terminated. "[T]he prospect of being fired at the conclusion of an extended process is not itself a constructive discharge." *Cigan v. Chippewa Falls Sch. Dist.*, 388 F.3d 331, 334 (7th Cir. 2004); *see also Rabinovitz v. Pena*, 89 F.3d 482, 489 (7th Cir. 1996)(reasoning that an aggrieved person must seek redress at the workplace prior to resigning prior to claiming she was constructively discharged). Plaintiff's reliance on the "you know when it's time to retire," and "you hold your age well," statements allegedly made by Roderick is misplaced. Remember, Plaintiff was not terminated; she resigned. It may be inferred that Roderick believed Plaintiff should retire. However, the statements do not require Plaintiff to retire and surely do not rise to the level of making the conditions of her workplace intolerable to a reasonable person. *Cf. Tutman v. WBBM-TV, Inc.*, 209

F.3d 1044, 1050 (7th Cir. 2000)(limiting constructive discharge cases to egregious cases, such as, for example, where an employee is subjected to threats or repeated racist taunting). Thus, these two, relatively mild, statements can not serve to support a constructive discharge theory.

Lastly, Plaintiff maintains she was lied to; specifically, she was told that the Title I program was being eliminated when, in fact, it was only being modified to include Reading Recovery. This point is irrelevant. Whether the Title I program was being eliminated or whether it was being modified to include Reading Recovery, the fact remains the same: Plaintiff would not be able to teach the Title I program. Surely, if the program was eliminated, there would be no program for her to teach. Equally unavailable, though, is that as Plaintiff was not trained in Reading Recovery techniques, she would not have been able to teach the modified Title I program.

At the end of the day, all Plaintiff had to do to remain employed by MSD was to reject Roderick's suggestion, which she was free to do. In fact, as Plaintiff knew of her job security via the agreements between the WCEA and MSD, it is unreasonable for her to think that she would be terminated if she did not resign. Simply, Plaintiff opted to resign when she did in order to receive the retirement incentive. This was Plaintiff's voluntary choice and, therefore, her claim must fail.

CONCLUSION

For the reasons set forth above, Defendant's Motion for Summary Judgment is **GRANTED**.  Accordingly, the Clerk is **ORDERED to DISMISS** this case **with prejudice**.


**DATED:  June 2, 2006**              /s/RUDY LOZANO, Judge
                                      **United States District Court**